Robert S. THOMPSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1069.

Court of Appeals of Alaska.

Feb. 3, 1989.

William F. Dewey, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ. Judges.

## OPINION

BRYNER, Chief Judge.

Following a jury trial, Robert S. Thompson was convicted of two counts of sexual abuse of a minor in the first degree, AS 11.41.434, and three counts of sexual abuse of a minor in the second degree, AS 11.41.436. Superior Court Judge J. Justin Ripley sentenced Thompson to consecutive terms of eight years for the first-degree sexual abuse convictions. For the second-degree sexual abuse convictions, the judge imposed suspended terms of five years. The terms were concurrent to each other but consecutive to Thompson's first-degree sexual abuse sentences.

Thompson appeals, contending that the trial court erred in denying his motion for a judgment of acquittal, in allowing a number of witnesses to testify about prior consistent statements that had previously been made by the complaining witness, in allowing a prosecution witness to express her opinion about the truthfulness of the complaining witness' testimony, and in admitting evidence of prior misconduct by Thompson. Thompson also contends that his trial counsel provided ineffective assistance. Finally, Thompson appeals his sentence as excessive. We reverse.

In April of 1984, J.T., an eight-year-old girl, told her school nurse, Paulette Wilson, that she was being physically abused by her mother's boyfriend, Robert Thompson. At the time, Thompson was living at home with J.T., her five-year-old sister, L.T., and the girls' mother, D.T. J.T. reported to Paulette Wilson that Thompson would force her to take off her clothing and beat her with his belt. J.T. showed Wilson bruises on her inner and outer thighs.

Wilson reported J.T.'s complaint to the Department of Family and Youth Services, (DFYS). DFYS investigator Dorothy Lee interviewed J.T. J.T. described the beatings to Lee but denied any incident of

sexual abuse. Shortly after DFYS began its investigation, the incidents of physical abuse apparently ceased.

Approximately six months later, on October 9, 1984, J.T.'s mother told her that she planned to marry Thompson and move to Louisiana. J.T. did not want to move to Louisiana and did not want Thompson as a father. The following day, J.T. wrote a note to nurse Wilson saying that Thompson had been touching her "in all the bad places." Wilson in turn notified DFYS investigator Dorothy Lee. Lee interviewed J.T. and confirmed the report of sexual abuse. Anchorage Police Officer Bill Reeder also talked to J.T. and obtained a statement from her.

J.T. reported that Thompson began sexually abusing her in the early summer, sometime after he had stopped beating her. J.T. said that the sexual abuse had occurred about fifteen times, always on Saturday mornings. According to J.T., Thompson would be lying naked on the couch, covered by a blanket, when J.T. entered the living room to watch Saturday morning cartoons. Thompson would invite J.T. to join him on the couch. He would remove her nightgown and touch her with his hands on her arms, chest, and genitals.

J.T. reported that Thompson would sometimes rub his penis against her. He would also place J.T.'s hand on his penis. J.T. claimed that, on several occasions, Thompson had inserted a finger into her vagina and that he had once inserted a finger into her anus.

As a result of her report of sexual abuse, J.T. was removed from her mother's home and placed in foster care. She entered into therapy with Pamela Kirk, a family counselor who specialized in working with sexually abused children. Charges of sexual abuse were filed against Thompson.

At Thompson's trial, nurse Paulette Wilson, DFYS investigator Dorothy Lee, and Anchorage Police Officer Bill Reeder were called as prosecution witnesses before J.T. testified. Wilson, Lee, and Reeder were permitted to describe the statements that J.T. had made to them concerning Thompson's sexual abuse. Thompson objected to

the prior consistent statements related by Lee and Reeder, but not to those related by Wilson. Thompson did object, however, to a question calling for Wilson to give her opinion concerning the truthfulness of J.T.'s claims. The objection was overruled, and Wilson was allowed to state her personal belief that J.T. had been truthful with her.

In her own trial testimony, J.T. repeated her claim that Thompson had engaged in various sexual touchings with her, but she denied that he had penetrated her vagina with his finger. In other respects, J.T.'s memory of many of the particulars that she had previously reported was vague, and many of her answers were elicited by the prosecution through the use of leading questions.

In support of its contention that Thompson had penetrated J.T.'s vagina with his finger, the state was allowed to admit J.T.'s prior statements to officer Reeder and to the grand jury indicating that penetration had occurred. The state also presented the testimony of Dr. Linda Ekman, who had conducted a physical examination of J.T. Dr. Ekman testified that J.T.'s vaginal opening appeared to be enlarged. According to Dr. Ekman, the condition was "indicative but not diagnostic," of sexual abuse.

The state also called J.T.'s therapist, Pamela Kirk, as a witness. Over Thompson's objection, Kirk was allowed to describe statements J.T. had made to Kirk concerning Thompson's sexual abuse. Kirk's testimony was not confined to J.T.'s prior inconsistent statement that Thompson had penetrated her vagina with his finger; rather, Kirk was allowed to give a full description of J.T.'s prior consistent statements as well.

Throughout the prosecution's case, the state was permitted to present testimony indicating that, before Thompson began sexually abusing J.T., he had physically abused her. Thompson did not object to the testimony concerning his physical abuse of J.T. The state also presented evidence establishing that Thompson had physically abused J.T.'s sister, L.T., and

that he had frequently been involved in violent disputes with the girls' mother, D.T. The trial court admitted this evidence over Thompson's repeated objections.

Thompson defended against the sexual abuse charges on the theory that J.T. had fabricated her claim because she did not want her mother to marry Thompson and move to Louisiana. Thompson did not dispute hitting J.T. with a belt, but he attempted to characterize his actions as disciplinary in nature, suggesting that the discipline motivated J.T. to resent Thompson's presence in her home.

To support his claim of fabrication, Thompson presented witnesses who testified that his relationship with J.T. appeared to be normal. Thompson also presented evidence indicating that he had been on hunting trips or at work on many of the Saturday mornings when J.T. claimed to have been sexually abused.

■ At the conclusion of the case, the jury found Thompson guilty of all charges. On appeal, Thompson initially claims that the trial court erred in denying his motion for a judgment of acquittal on Count 1 of the indictment, which alleged that Thompson sexually penetrated J.T.'s vagina with his finger. Pointing out that, in her trial testimony, J.T. denied that vaginal penetration had occurred, Thompson contends that the only evidence supporting conviction on Count 1 consisted of J.T.'s uncorroborated prior claims of vaginal penetration, which were admitted as prior inconsistent statements. Thompson relies on *Brower v. State*, 728 P.2d 645 (Alaska App. 1986), arguing that J.T.'s prior inconsistent statements are legally insufficient to support a conviction.

In *Brower*, the complaining witness in a sexual assault case testified against the defendant before the grand jury but retracted his testimony at trial. The witness was impeached at trial by the prior inconsistent testimony he had given before the grand jury. The prior inconsistent statements were the only evidence supporting conviction. We reversed, holding that a conviction could be based on the complaining witness' prior inconsistent statements

only if corroborating evidence existed. *Brower*, 728 P.2d at 647–48.

Subsequently, in *Bodine v. State*, 737 P.2d 1072 (Alaska App.1987), we adopted a flexible reading of *Brower's* corroboration requirement. We described the corroboration requirement as "grounded in common sense: corroborating evidence is sufficient where it induces a rational belief in the truthfulness of a witness' testimony." *Bodine*, 737 P.2d at 1075. We held that, to be sufficient, corroborating evidence need not relate directly to the unlawful act charged in the indictment. *Id.* at 1075–76.

In the present case, ample corroborating evidence was presented to support a conviction on Count 1. In particular, Dr. Ekman testified that J.T.'s physical condition was indicative of sexual abuse. Of equal significance was Dr. Ekman's testimony concerning J.T.'s reaction to the medical examination. Dr. Ekman described J.T. as exhibiting "a very unusual type of a reaction:"

> She became very—she started sweating, her heartrate went up, she almost passed out, she was—throw up, she was just very physically distressed by the whole examination.

Dr. Ekman testified that she had seen hysterical reactions with children who had been sexually abused, that the reaction was indicative of sexual abuse, and that J.T.'s reaction was "probably the most dramatic physical reaction" she had ever seen.

Thompson argues that Ekman's testimony does not meet the corroboration requirement because it fails to establish a "specific instance of penetration." This argument, however, ignores the flexible approach to corroboration we adopted in *Bodine*. Nothing in either *Brower* or *Bodine* requires that the corroborating evidence be sufficient to independently establish the commission of an illegal act.

Here, the corroborating evidence was sufficient to induce "a rational belief in the truthfulness of [J.T.'s] testimony." *Bodine*, 737 P.2d at 1075. When viewed in the light most favorable to the state, the totality of the evidence would allow a reasonable juror to conclude beyond a reason-

able doubt that Thompson was guilty of sexually penetrating J.T.'s vagina with his finger. *See Beck v. State*, 408 P.2d 996, 997 (Alaska 1965). Accordingly, the trial court did not err in denying the motion for a judgment of acquittal.

■ Thompson next challenges the trial court's admission of testimony concerning J.T.'s prior consistent statements. Three witnesses testified concerning J.T.'s prior consistent statements before J.T. was called to the stand: nurse Wilson, investigator Lee, and officer Reeder. After J.T. testified, Pamela Kirk was also allowed to testify extensively about prior statements made to her by J.T. that were consistent with J.T.'s trial testimony.

The trial court apparently concluded that all of the evidence concerning J.T.'s prior consistent statements was admissible under the "first complaint doctrine" of *Greenway v. State*, 626 P.2d 1060 (Alaska 1980).

On appeal, the state correctly recognizes that, with the exception of Wilson's description of J.T.'s initial complaint of abuse, J.T.'s prior consistent statements were not admissible under *Greenway*. That case is limited to the admission of the complaining witness' first complaint. Even as to the first complaint, *Greenway* does not allow a detailed description of the complaining witness' allegations. The case permits only evidence of the fact of the complaint and the circumstances under which it was made.

The state similarly recognizes that admission of the disputed prior consistent statement evidence in this case was not permissible under the provisions of Alaska Rule of Evidence 801(d)(1)(B), which classifies as non-hearsay a witness' prior consistent statements when offered to rebut a charge of recent fabrication.[1] In *Nitz v. State*, 720 P.2d 55 (Alaska App.1986), this court dealt with the admissibility of prior

consistent statements in cases involving sexual abuse of children. We noted that, under the traditional approach, a witness' prior consistent statements become admissible only under limited circumstances: such statements can properly be admitted only to rebut a charge of recent fabrication or improper influence or motive, and only when the prior statements were made before the witness' motive to testify falsely first arose. *Id.* at 64.

*Nitz*, however, expanded the scope of admissibility for prior consistent statements in cases involving sexual abuse of children. While retaining the traditional rule against the admission of a witness' prior consistent statements until after that witness had testified and been impeached, *Nitz* held that prior consistent statements could be admitted even when they were made after the witness' motive to testify falsely had already arisen. *Id.* at 67.

Under *Nitz*, admissibility is predicated on an initial determination that the prior statement, regardless of when it arose, is "actually relevant 'to rebut an express or implied charge ... of recent fabrication or improper influence or motive.'" *Nitz*, 720 P.2d at 68. Moreover, in each case, the probative value of the evidence must be found to outweigh its potential for prejudicial impact. *Id.* Finally, if the prior statement was made after the witness' alleged motive to testify falsely had already arisen, the prior statement may be considered only for the limited purpose of determining the credibility of the witness. *Id.*

Applying the *Nitz* criteria to this case fails to alter the conclusion that the testimony of Lee, Reeder, and Kirk concerning J.T.'s prior consistent statements was improperly admitted. Lee and Reeder testified before J.T. had even taken the stand and been impeached. Furthermore, apparently because the trial court mistakenly concluded that all of J.T.'s prior consistent statements were admissible under *Green-*

---

1. Alaska Rule of Evidence 801(d)(1)(B) states:

    (d) *Statements which are not hearsay.* A statement is not hearsay if

    (1) *Prior statement by witness.* The declarant testifies at the trial or hearing and the statement is

    (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive....

*way,* the court did not determine whether or to what extent the prior statements were actually relevant to the issue of J.T.'s credibility. Nor did the court balance the probative value of the statements against their potential for prejudice. Finally, although all of the prior statements were made after J.T.'s alleged motive to testify falsely had already arisen, the court did not instruct the jury that the evidence of J.T.'s prior consistent statement could be considered only on the issue of her credibility.[2]

■ The state concedes that much of the evidence concerning J.T.'s prior consistent statements was erroneously admitted under the *Nitz* standard; the state nonetheless urges us to find that the error was, at most, harmless.[3]

In *Nitz,* we identified various ways in which premature and unrestricted admission of prior consistent statements can result in unfair prejudice to the accused in cases of child sexual abuse. First, admitting evidence of prior consistent statements before the victim's testimony is attacked may force the defendant to attack the victim's credibility, rather than giving the defendant the option of relying solely on weaknesses in the witness' unbolstered testimony. *Nitz,* 720 P.2d at 70. Second, the trial court will often be unable to accurately balance the actual relevance of the prior consistent statements against their prejudicial effect prior to the victim's testimony. Third, when the prior consistent statements are introduced before there has been any attempt to impeach, the jury is likely to treat the prior statements as substantive

proof, regardless of their probative value on the issue of recent fabrication. Finally, the premature admission of the victim's prior consistent statements creates the danger that the jury may accept the witness' view of the victim's credibility before the victim testifies:

> This class of prejudice is particularly great and is particularly susceptible to abuse in cases such as the present one: here, the evidence of guilt consisted almost entirely of the testimony of an unsophisticated and relatively inarticulate child; her prior statements were presented to the jury through a series of articulate adult witnesses, whose ranks included credentialed professionals with extensive experience in dealing with sexual assault cases.

*Nitz,* 720 P.2d at 71.

When assessed under these criteria, the actual prejudice resulting from the erroneous admission of J.T.'s prior consistent statements in this case appears to be significantly less serious than the prejudice that led us to reverse in *Nitz.*

In *Nitz,* seven witnesses testified concerning the victim's prior consistent statements before the victim herself was called. Prior to admission of the challenged testimony, the defense had done nothing to indicate that it would claim recent fabrication or otherwise impeach the victim's testimony. The victim's testimony in *Nitz* was virtually uncorroborated. By contrast, in the present case, three witnesses testified to J.T.'s prior consistent statements before she took the stand; the testimony of one of

---

**2.** The state asserts that the trial court gave appropriate limiting instructions on two occasions. This assertion is not supported by the record. On one occasion, nurse Wilson was asked to describe information that she had received from a friend of J.T. The information had led Wilson to contact J.T. Upon defense objection, the court instructed the jury that the evidence was offered for the limited purpose of establishing the actions that Wilson took in response to the information she received. On the second occasion, Thompson objected to testimony by DFYS investigator Lee concerning a statement by J.T. indicating that she wished to leave her foster home. Again, the court instructed the jury that this testimony was being offered for the limited purpose of explaining Lee's actions. Nothing in the context of either limiting

instruction suggests that they were directed at the entirety of the evidence relating to J.T.'s prior consistent statements.

**3.** The state also seems to suggest that the application of the *Nitz* standard to this case is unfair because *Nitz* was decided after Thompson's trial had been completed. As we have indicated in our opinion, however, the *Nitz* rule expanded the traditional approach to the admission of prior consistent statements under A.R.E. 801(d)(1)(B). Under the traditional approach, J.T.'s prior consistent statements would have been *per se* inadmissible, because they were all made after J.T.'s motive to testify falsely had already arisen.

those witnesses, Wilson, was admissible under the *Greenway* rationale. Additionally, Thompson, in his opening statement, had already announced his intention to assert that J.T.'s claim of sexual abuse was a recent fabrication. Moreover, the evidence corroborating J.T.'s claims in the present case, while perhaps not overwhelming, was at least substantial.

Despite the distinctions between Thompson's case and *Nitz*, we believe the harmless error issue to be a close one. Although fewer witnesses testified improperly about J.T.'s prior inconsistent statements, the testimony nevertheless amounted to a considerable portion of the state's case-in-chief. J.T.'s own trial testimony was considerably weaker than her prior out-of-court statements. At trial, J.T. suffered from numerous lapses in memory, and much of what she did recall could only be elicited by leading questions. Although Pamela Kirk's prior consistent statement testimony was given after J.T. had taken the stand, the trial court allowed its admission without any determination of the relevancy of the prior consistent statements. Neither did the court balance its probative value against its potential for prejudice. Without proper limiting instructions, the jury was free to consider all of the prior consistent statements evidence in the case for the truth of the matter contained therein.

Under the circumstances, we believe that the challenged prior consistent statements evidence—by the sheer weight of its repetition and by its recital through three experienced witnesses—posed an unnecessary risk of channeling the jury's attention away from a proper evaluation of J.T.'s own testimony. On balance, however, we find it unlikely that the error, standing alone, appreciably affected the jury's verdict. *Love v. State*, 457 P.2d 622, 634 (Alaska 1969). The prejudice stemming from the erroneous admission of J.T.'s prior consistent statements must nonetheless be considered in conjunction with any prejudice arising in connection with the other claims of error that Thompson has advanced.

Thompson's next claim is that the trial court erred in allowing J.T.'s school nurse, Paulette Wilson, to express her personal belief in the truthfulness of J.T.'s testimony. Wilson was called as the prosecution's first witness and testified primarily about J.T.'s initial reports of physical and sexual abuse. At the close of her testimony on direct examination, however, Wilson was asked, over Thompson's objection, whether she believed J.T. was truthful. Wilson gave a long narrative answer detailing her contacts with J.T. and concluding, "I believe her. I think she's truthful."

On appeal, Thompson challenges the admission of Wilson's testimony, citing authority from other jurisdictions condemning the use of expert testimony to vouch for, or "validate," the credibility of another witness. This court has previously disapproved the use of expert opinions to vouch for the truthfulness of trial testimony, noting the inappropriateness of having an expert serve, in effect, as a human polygraph. *See, e.g., Anderson v. State*, 749 P.2d 369, 373 (Alaska App.1988); *Rodriquez v. State*, 741 P.2d 1200, 1203–05 (Alaska App.1987); *Colgan v. State*, 711 P.2d 533, 534 (Alaska App.1985).

Wilson's testimony, however, does not fit neatly into the category of evidence condemned in *Anderson, Rodriquez,* and *Colgan.* The state correctly points out that Wilson was not formally qualified as an expert witness and did not purport to base her opinion as to J.T.'s veracity on any scientific theory or technique.

Wilson's opinion testimony is nevertheless troublesome, since it appears to have been improperly admitted, regardless of the applicability of *Anderson, Rodriquez,* and *Colgan.* Under Alaska Rule of Evidence 608(a),[4] a witness may express an

**4.** Alaska Rule of Evidence 608(a) provides:

(a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness; and (2) evidence of truthful charac-

opinion as to another witness' veracity only after the other witness has testified and been impeached. Moreover, the rule permits an opinion to be stated only as to the other witness' general character for truthfulness. It does not allow an opinion as to the truthfulness of the testimony actually given at trial.

Although Thompson, in his opening statement, announced his intent to impeach J.T., she had not yet testified or been impeached when Wilson testified.[5] Of greater concern is the scope of Wilson's testimony. Wilson went beyond stating her opinion as to J.T.'s general character for truthfulness. In context, it appears that Wilson was allowed to express her personal belief in the truth of the accusations that J.T. made against Thompson.

Thus, Wilson was in effect allowed to express her personal belief that J.T. had been sexually assaulted by Thompson. In this regard, it is notable that, even though Wilson had not been formally qualified as an expert and did not purport to state an expert opinion, almost all of Wilson's contact with J.T. had been in a professional context, in the course of Wilson's employment as a school nurse. In presenting Wilson's testimony, the state went to considerable lengths to establish Wilson's educational background and professional experience.

Even so, we would again be inclined to conclude that, because Wilson did not actually testify as an expert or purport to give an expert opinion, the erroneous admission of her testimony concerning J.T.'s credibility did not in itself amount to reversible error. The potential for prejudice stemming from this testimony, however, compounds the prejudice arising from the improper admission of J.T.'s prior consistent statements. In combination with the prior consistent statements evidence, Wilson's testimony enabled the prosecution to cement in the jury's mind both the substance and veracity of J.T.'s accusations against Thompson before J.T. even took the stand and before her testimony could actually be impeached. This is precisely the type of situation that concerned us in *Nitz*. By the time J.T. testified, the jury might already have been convinced of her story, ignoring the paramount need to evaluate the credibility of her testimony.

The cumulative effect of this error must in turn be considered in conjunction with yet another point of error raised by Thompson. Thompson has additionally challenged the trial court's admission of evidence concerning his prior physical abuse of J.T., her younger sister, L.T., and their mother, D.T.

■ Thompson's trial counsel did not object to the evidence of his prior physical abuse of J.T. On appeal, Thompson contends that the admission of this prior bad acts evidence amounted to plain error. Yet, it appears likely that Thompson's trial counsel made a tactical decision to characterize Thompson's prior physical abuse of J.T. as parental discipline and to rely on

ter is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

**5.** The state acknowledges that, under A.R.E. 608(a), Wilson's testimony was premature. However, it attempts to minimize the significance of the premature admission, analogizing this case to cases such as *United States v. Bileck,* 776 F.2d 195, 197–98 (7th Cir.1985), and *United States v. Medical Therapy Sciences, Inc.,* 583 F.2d 36, 39 (2d Cir.1978), *cert. denied,* 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979), in which courts have allowed prosecutors to impeach their own witnesses in anticipation of defense impeachment. We see little similarity, however, between the impeachment by the government of its own witness while the witness is on the stand, and the premature use of a witness to bolster the testimony of another witness before the other witness has even taken the stand.

The state has also analogized the present case to *United States v. Fusco,* 748 F.2d 996, 998–99 (5th Cir.1984). *Fusco,* however, is inapposite. There, the appellate court found that the disputed evidence, testimony concerning a DEA informant's prior work with the government, had not actually been admitted on the issue of general credibility; the evidence had been independently admissible on the issue of bias. Here, to the extent that Wilson's opinion was potentially admissible, its admissibility was based only on the issue of J.T.'s general character for truthfulness. The state has established no independent grounds supporting the admission of the challenged evidence.

this explanation as a possible motive for J.T. to fabricate her claim of sexual abuse. Given the possibility that the failure to object at trial was tactical, we decline to find plain error. *See Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985); *Clemans v. State,* 680 P.2d 1179, 1186 (Alaska App.1984).

While Thompson did not object to the evidence relating to J.T., he did object to evidence concerning his prior physical abuse of L.T. and D.T. These objections were overruled by the trial court. On appeal, the state concedes that the challenged evidence was inadmissible under Alaska Rule of Evidence 404(b).[6] The state nevertheless urges us to find harmless error, contending that the improper evidence of Thompson's violence toward L.T. and D.T. was essentially cumulative of the evidence concerning his physical abuse of J.T.

█ In our view, the error cannot be dismissed as harmless. By allowing the state to establish Thompson's violent conduct toward L.T. and D.T. in addition to J.T., the trial court essentially enabled the state to depict Thompson as a man who was generally prone to violent abuse of women. The state took advantage of this opportunity during its closing argument by mounting a broad-based attack on Thompson's character. In its argument, the state

theorized that Thompson had a psychological need to inflict violence. According to the state's theory, when J.T. initially reported Thompson's physical abuse, he was thwarted from inflicting further physical abuse on J.T., L.T., and their mother, and consequently he turned to sexual abuse as an outlet for his psychological needs.[7]

Even if the error were deemed harmless in isolation, it did not occur in isolation. Rather, the prejudicial effect of the error in admitting evidence of Thompson's other bad acts must be added to the prejudice resulting from the improper use of J.T.'s prior consistent statements and from the improper admission of Wilson's opinion testimony. Having reviewed the record, we believe that the cumulative effect of these errors deprived Thompson of a fair trial. *See Pletnikoff v. State,* 719 P.2d 1039, 1045 (Alaska App.1986); *Drumbarger v. State,* 716 P.2d 6, 16 (Alaska App.1986).

Accordingly, the conviction is REVERSED, and this case is REMANDED for a new trial.[8]

---

**6.** A.R.E. 404(b) provides:

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**7.** The propriety of the state's argument would be questionable, even if it had not been based on evidence that was improperly admitted. *See, e.g., Page v. State,* 657 P.2d 850, 853 (Alaska App.1983), where we held that, absent expert evidence to establish a nexus, evidence concern-

ing the victim's possession of homosexual pornography was irrelevant in a homicide case to establish the likelihood that the victim attempted a homosexual rape of the defendant. Here, absent some expert testimony to establish a nexus, it is debatable whether Thompson's propensity toward physical abuse gives rise to a fair inference that he would be prone to commit sexual abuse.

**8.** Because Thompson is currently represented by new counsel, our decision reversing his conviction makes it unnecessary to consider his claim of ineffective assistance of counsel at trial. Similarly, we need not consider Thompson's sentence appeal.