NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| BENJAMIN VAITULUI LEGA,<br><br>      Appellant,<br><br>  v.<br><br>STATE OF ALASKA,<br><br>      Appellee. | Court of Appeals No. A-11926<br>Trial Court No. 3PA-13-283 CR<br><br>O P I N I O N<br><br>No. 2593 — March 16, 2018 |

Appeal from the Superior Court, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Marjorie A. Mock, Anchorage, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Michael Sean McLaughlin, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Benjamin Vaitului Lega was convicted of kidnapping and robbery, based on evidence that he and an accomplice, Arthur Gray, kidnapped and stole money from two Big Lake residents, Judy Holmes and Michael Gearing. The kidnapping was ended when the police conducted a traffic stop of the vehicle in which all four people were riding.

In this appeal, Lega argues that his trial judge committed error by allowing the prosecutor to introduce various statements that the two victims, Holmes and Gearing, made to the police after the officers had ended the kidnapping and freed the victims.

For the reasons explained here, we conclude that some of Holmes's and Gearing's prior statements were properly admitted, and that the trial judge's error in admitting the remainder of the prior statements was harmless.

*Underlying facts*

Late in the evening on February 2, 2013, Judy Holmes was dozing in a chair at her home in Big Lake when she was awakened by her dogs barking. When Holmes opened her eyes, she saw Arthur Gray (Lega's co-defendant) pointing a gun at her. Benjamin Lega was also present in the room.

According to Holmes's testimony, Gray and Lega asked her to give them money — $17,000 that they claimed Holmes owed to a woman in Anchorage. When Holmes told Lega and Gray that she had no idea what they were talking about, the men began searching Holmes's house for money and valuables.

At some point, Holmes's boyfriend, Michael Gearing, walked over to Holmes's house to check on her. (Gearing lived in a separate cabin on Holmes's property.) When Gearing tried to enter the house, he was intercepted by Lega, who pointed a gun in Gearing's face.

While Gray guarded Holmes, Lega escorted Gearing to his cabin. Lega searched the cabin and found Gearing's wallet and bank cards. When they left the cabin, Lega noticed a Quonset hut that contained marijuana plants. Lega ordered Gearing to cut down all these plants and set them aside.

Lega and Gearing then returned to Holmes's house. Lega and Gray decided to force Holmes and Gearing to drive back to Anchorage — to clear things up by bringing Holmes face to face with the woman who claimed that Holmes owed her money.

At Lega's and Gray's direction, the valuables from Holmes's house, plus the freshly cut marijuana plants and Gearing's television, were all loaded into Holmes's vehicle, a Ford Explorer. Lega and Gray then forced Gearing to drive the Explorer toward Anchorage, with Holmes riding handcuffed in the rear seat.

Shortly before 2:00 a.m. that morning (February 3, 2013), Officer William Rapson observed a Ford Explorer driving on the Parks Highway near Wasilla. The car's headlights were flashing erratically, so Officer Rapson conducted a traffic stop of the vehicle. Gearing was in the driver's seat, with Lega in the front passenger seat next to him. Gray and Holmes were in the back seat.

Officer Rapson testified that he could smell a "strong odor of marijuana" coming from the vehicle, and he saw a bag in the cargo area that appeared to contain marijuana plants. Rapson also observed what appeared to be a rifle case inside the car.

When Officer Rapson attempted to speak to Gearing, Lega kept interrupting, and Lega answered many of the questions that Rapson directed to Gearing. It seemed to Officer Rapson that Lega was trying to end the contact as quickly as possible. When Rapson asked each occupant for identification, all of them claimed not to be carrying identification. Officer Rapson then asked each passenger for their name, so he could check the APSIN database for arrest warrants. Rapson was able to locate

three of the occupants' names in APSIN, but he could not find Lega's name — because Lega had given the officer a false name.

At this point, Officer Rapson had Gearing get out of the car, intending to question him about the rifle case and the marijuana. Once Gearing was outside the vehicle, he told Officer Rapson that he and Holmes had been robbed and kidnapped by Lega and Gray. Officer Rapson radioed for backup. He then patted down Gearing and placed him in his patrol car.

By the time Gearing was secured in Rapson's patrol car, backup police and troopers had arrived on the scene. The officers first removed Lega from the vehicle, then Gray, and finally Holmes. When Holmes was removed from the vehicle, the officers observed that she was bound with handcuffs.

Holmes was moved to a patrol vehicle, and she was briefly questioned by State Trooper Paul Wegrzyn. Holmes corroborated Gearing's statement that she and Gearing had been robbed and kidnapped. In her conversation with Wegrzyn, Holmes furnished the basic details of the robbery and kidnapping.

The officers then drove Holmes and Gearing in separate patrol cars to the Mat-Su West trooper post. There, they were separately interviewed by Troopers Michael Henry and David Bower.

Meanwhile, Officer Rapson and Trooper Wegrzyn drove to Holmes's residence to look for evidence of the alleged robbery and kidnapping. They found that the interior of Holmes's house appeared to have been ransacked: items were strewn across the floor, including a gun holster, a broken cell phone, and cards of the type that would be carried in a wallet (*e.g.*, business cards). Outside the home, the officers found fresh marijuana leaves lying on the snow.

Based on the circumstances of the traffic stop, and on Holmes's and Gearing's separate statements, the officers concluded that Holmes and Gearing were

telling the truth about being robbed and kidnapped. Trooper Henry then drove them back to Holmes's house. On the way, they talked further about what had happened, and Trooper Henry recorded this conversation.

When the three arrived at Holmes's house, Trooper Henry entered the house with Holmes and Gearing, and he accompanied them as they walked around the crime scene and talked again about the events of the evening. Henry recorded this conversation as well.

These various prior statements made by Holmes and Gearing became an issue at trial because of the theory of defense asserted by the attorneys representing Lega and his co-defendant Gray.

The defense contended that all four people involved — Lega, Gray, Holmes, and Gearing — were actually partners in a marijuana growing scheme, and that Holmes and Gearing (plotting beforehand) had concocted a story to tell the police in case they were ever stopped and questioned — a story about being robbed and kidnapped by Lega and Gray.

Because this was the defense theory of the case, the trial judge allowed the State to introduce the various statements made by Holmes and Gearing after they were stopped by the police — under the theory that these statements were "prior consistent statements" as defined in Alaska Evidence Rule 801(d)(1)(B). The prior statements at issue were:

1. the statement that Holmes made to a police officer at the scene of the traffic stop;

2 & 3. the statements that Holmes and Gearing made when they were questioned separately by the police within an hour following the traffic stop; and

4 & 5. the two recorded conversations that took place after the police concluded that Holmes and Gearing were telling the truth about being kidnapped. One of these conversations occurred while Holmes and Gearing were riding in a patrol car back to Holmes's residence, where the robbery and kidnapping began. The other conversation took place after Holmes and Gearing arrived at Holmes's residence, when they toured the residence with Trooper Henry while the officers were looking for physical evidence.

In this appeal, Lega contends that the trial judge committed error by allowing the State to introduce Holmes's and Gearing's prior statements, and that this error requires reversal of his conviction.

*The applicable law*

Alaska Evidence Rule 801(d)(1)(B) governs the admissibility of a witness's out-of-court statements when those prior statements are consistent with the witness's trial testimony.

Generally speaking, Alaska Evidence Rule 801(d)(1)(B) allows a party to introduce the prior statement of a witness when the other party attacks the witness's trial testimony as being the product of "recent fabrication", or the product of "improper influence or motive". But the more precise rule is set forth in this Court's decisions in *Nitz v. State*, *Nusinginya v. State*, and *Thompson v. State*.[1] In those cases, this Court interpreted Evidence Rule 801(d)(1)(B) as allowing the admission of a prior consistent statement in two distinct situations:

---

[1] *Nitz v. State*, 720 P.2d 55 (Alaska App. 1986); *Nusinginya v. State*, 730 P.2d 172 (Alaska App. 1986); *Thompson v. State*, 769 P.2d 997 (Alaska App. 1989).

If the witness's prior consistent statement *pre-dates* the alleged motive for fabrication or the alleged improper influence — *i.e.*, if the prior consistent statement was made before the asserted impetus for fabrication arose — then the prior statement is admissible as *substantive* evidence. *See Nitz*, 720 P.2d at 66. That is, the jury is allowed to rely on the prior consistent statement, not just for purposes of assessing the credibility of the witness's trial testimony, but also as independent evidence of the truth of the matters asserted in the prior statement.

If the witness's prior consistent statement does *not* pre-date the asserted motive to fabricate or the asserted improper influence, the prior consistent statement can nevertheless be admissible if the trial judge concludes that the *circumstances* of the prior statement reasonably bolster the credibility of the witness's trial testimony — apart from the mere fact that the prior statement is consistent with the witness's trial testimony. *See Nitz*, 720 P.2d at 58, 66; *Nusinginya*, 730 P.2d at 174; *Thompson*, 769 P.2d at 1001.

In *Nitz*, for example, the defendant asserted that the victim had fabricated allegations of sexual abuse so that Nitz would be removed from her family home.[2] But the evidence showed that the victim had "consistently been reluctant to discuss Nitz's offenses" — that her early accounts of the abuse "included only partial details", and that "considerable efforts had to be expended over a lengthy period of time before [the victim] was willing to discuss her experiences more fully and openly."[3] Given these circumstances, we concluded that the victim's prior statements had relevance that derived, not so much from the fact that the prior statements were consistent with the victim's trial testimony, but rather from the circumstances and manner in which the

---

[2] *Nitz*, 720 P.2d at 68.

[3] *Ibid.*

victim made those prior statements. [4]   That is, the victim's repeated reluctance to fully discuss these matters was seemingly inconsistent with the defense assertion that the victim purposely made false allegations in order to rid herself of Nitz.

However, if a prior statement is admitted under this second rationale, the jury can not consider it as substantive evidence.   The witness's prior statement is only admissible for purposes of assessing the credibility of the witness's trial testimony. [5]

### *Our analysis of the trial judge's ruling*

In Lega's case, the trial judge concluded that Holmes's and Gearing's prior statements did not pre-date their alleged motive to falsify, but that those prior statements were nevertheless admissible under *Nitz* to bolster the credibility of Holmes's and Gearing's trial testimony.   The judge therefore allowed the prosecutor to introduce all of the prior statements, and to introduce those statements in their entirety.

The judge's ruling is problematic in two respects.

First, the judge did not specifically address the *circumstances* of Holmes's and Gearing's prior consistent statements, nor did he explain why those circumstances were probative of Holmes's and Gearing's credibility as trial witnesses, apart from the mere fact that the prior statements were consistent with their trial testimony.

Second, the judge did not evaluate whether Holmes's and Gearing's statements should be admitted in their entirety, or whether those statements should be abridged or summarized owing to considerations of cumulativeness, waste of time, or unfair prejudice. *See* Evidence Rule 403.  Here, the judge allowed the prosecutor to play

---

[4]   *Ibid.*

[5]   *Nitz*, 720 P.2d at 58, 68.

the entire audio recordings of Holmes's and Gearing's prior statements — recordings that (taken together) were hours long.

As this Court noted in *Thompson*, the "sheer repetition" of a witness's account presents the risk that the jury's attention may be improperly diverted from its task of evaluating the witness's live testimony. [6] Moreover, as explained in *Nitz*, when a witness's prior statements are admitted into evidence, especially at such length and in such detail, there is an inherent potential for unfair prejudice because the jury may fall prey to "the false impression that repetition adds substance to the [witness's] story" [7] — when, in fact, repetition of the witness's story adds nothing of substance unless the *timing* or the other *circumstances* of the prior statements will assist the jury in evaluating the credibility of the witness's in-court testimony.

Thus, when either party proposes to introduce a witness's prior consistent statements under Evidence Rule 801(d)(1)(B), it is important for trial judges to engage in the analysis we have described here. That was not done in the present case.

Nevertheless, with regard to the statement that Holmes made at the scene of the traffic stop, and with regard to the statements that Holmes and Gearing gave to the police when they were separately interviewed shortly after the traffic stop, we conclude that the circumstances of these statements provided ample justification for admitting this evidence — because the circumstances of these statements obviously supported the inference that Holmes and Gearing were telling the truth at trial.

Holmes and Gearing separately gave detailed and largely matching descriptions of what had happened to them. In their descriptions, Holmes and Gearing provided specific details of the kidnapping — the chronology of events, the words that

---

[6] *Thompson*, 769 P.2d at 1003.

[7] *Nitz*, 720 P.2d at 69.

Lega and Gray spoke during the kidnapping, the specific ways in which Lega and Gray used force against Holmes and Gearing, and the places on the property where these assaults occurred.

It was improbable that Holmes and Gearing could have manufactured this kind of detail beforehand, and they had no time to manufacture this kind of detail after the police ended the kidnapping and took the two of them away for separate interviews. Thus, as in *Nitz*, the relevance of Holmes's and Gearing's prior statements derived, not so much from the fact that the prior statements were consistent with their trial testimony, but rather from the circumstances of the prior statements.

The situation is more complicated with respect to Holmes's and Gearing's later statements — their statements in the patrol car on the way back to Holmes's residence, and then their statements at the residence.

As we have explained, the audio recordings of those statements were quite long. This meant that a significant portion of the jury's time was spent listening to Holmes's and Gearing's out-of-court statements — raising concerns under Evidence Rule 403. And to the extent that the judge allowed the prosecutor to play these later statements merely because they were repetitions of what Holmes and Gearing had already told the police in their earlier statements, or repetitions of what Holmes and Gearing said in their trial testimony, this would be error under *Nitz*.

Nevertheless, even if it was improper to admit those later statements, or even if those later statements should only have been presented in a much-abridged form, any error was harmless. As we have explained, Holmes's and Gearing's earlier statements were properly admitted. Moreover, the State's version of events was directly corroborated by the physical evidence in the case (most significantly, the condition of Holmes's and Gearing's residences, and the fact that Holmes was bound in handcuffs in the car). This version of events was substantially more plausible than the defense theory

of the case. Because of this, we can confidently say that the admission of the later statements did not appreciably affect the jury's verdicts. [8]

Accordingly, the judgement of the superior court is AFFIRMED.

---

[8] *See Love v. State*, 457 P.2d 622, 634 (Alaska 1969) (holding that, for instances of non-constitutional error, the test for harmlessness is whether the appellate court "can fairly say that the error did not appreciably affect the jury's verdict").