Douglas SHELDON, Appellant,

v.

STATE of Alaska, Appellee.

No. 1059.

Court of Appeals of Alaska.

July 27, 1990.

Tricia Collins, Juneau, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Douglas Sheldon was convicted by a jury of two counts of sexual abuse of a minor in the second degree, a class B felony, in violation of AS 11.41.436(a)(2).[1] He was acquitted of one count of sexual abuse of a minor in the first degree, in violation of AS 11.41.434(a)(2).

Sheldon appeals. He argues that the trial court erred by failing to dismiss the indictment, by failing to grant a judgment of acquittal at the close of the evidence, and by permitting the introduction of evidence which he alleges violated his constitutional right to confrontation. We affirm.

Sheldon's victim was his stepdaughter, J.J., who was seven years old at the time of the grand jury indictment and eight years old at the time of trial. J.J. told W.J., her eleven-year-old brother, that "Dad [Sheldon] rapes me." In April 1987, W.J. told his teacher about J.J.'s claim. The teacher informed social worker, Deborah Schorr. Schorr interviewed J.J. and W.J. and reported the interview to the police. J.J. told Schorr that Sheldon had touched J.J.'s private parts sometime prior to December 1986. J.J. told Schorr and police officers that she was touched three times: once on a trip to the Breeze Inn, once in Sheldon's bedroom, and once in her own bedroom.

W.J. and J.J. testified before the grand jury on May 7, 1987. W.J. repeated the conversation in which J.J. told him Sheldon was "raping" her. J.J. testified to three incidents which occurred before Christmas of 1986: one, on the way to the Breeze Inn Sheldon took her into the bushes, pulled their pants down, got on top of her, and touched her between the legs; two, in Shel-

---

1. One of the counts of sexual abuse of a minor was a lesser-included offense of the original charge of first-degree sexual abuse of a minor. AS 11.41.434(a)(2).

don's bedroom, he tried to put his penis into her; and three, in J.J.'s bedroom Sheldon woke her up and kept touching her in the private area between her legs.

After J.J. completed her testimony, a grand juror asked whether J.J. was "examined by a professional man to find out whether there was penetration." The prosecutor responded, "I can't answer that question because to answer it would be for me to be testifying." A juror then asked if the grand jury could have Schorr as a witness, apparently in order to find out if J.J. had been examined by a health professional. The prosecutor told the grand jury it could call Schorr if it wished, but that Schorr could not repeat the details of what J.J. had told her.

J.J. had in fact been examined by Dr. Randall Wiest two days before the grand jury convened. Dr. Wiest found no evidence of sexual contact or penetration. The results of the exam were made known to the district attorney's office the day before the grand jury convened, and a memo was put into the file regarding the results.

The grand jury retired, deliberated, and returned a three-count indictment against Sheldon without calling additional witnesses. The first count, sexual abuse of a minor in the second degree, involved the incident of sexual contact on the way to the Breeze Inn. The second count, sexual abuse of a minor in the first degree, charged an act of sexual penetration in Sheldon's bedroom. The third count, sexual abuse of a minor in the second degree, charged an act of sexual contact in J.J.'s bedroom. Prior to trial, Sheldon moved to dismiss the indictment on the grounds that:

(1) The charge given to the grand jury was constitutionally defective because it did not explain the degree of proof required for a conviction at trial;

(2) The state failed to present exculpatory evidence to the grand jury. The prosecutor who presented the case to the grand jury submitted an affidavit indicating that he did not recall receiving the memo prior to grand jury and, if he had, he would not have presented

the the memo as he did not view it as exculpatory.

The trial court denied Sheldon's motion to dismiss.

At trial, J.J. initially testified that she did not remember any of the incidents of sexual abuse. J.J. did testify that she remembered listening to a tape of her grand jury testimony regarding the incidents and verified that what she had said at grand jury was true. When she was questioned about the sexual abuse, J.J. began to cry and would not answer the question. To help refresh her recollection, J.J. listened to the grand jury tape of her testimony a second time outside the presence of the jury. Later, J.J. testified about the Breeze Inn incident. She said that after taking her into the bushes, Sheldon removed her pants and touched her "private parts." She also testified that Sheldon had come into her room but had not done anything else.

The district attorney then moved to play the grand jury tape of J.J.'s testimony to the jury. Over defense objection, the tape was played before the jury and admitted into evidence. Superior Court Judge Thomas M. Jahnke found that the circumstances surrounding J.J.'s previous statements concerning sexual abuse and the fact that she acknowledged testifying truthfully before the grand jury provided sufficient corroboration of her testimony to allow the jury to hear the grand jury tape.

On cross-examination, J.J. testified that she did not like it when Sheldon drank and hit her mother. She further testified that her mother told her that if Sheldon ever touched her in a bad place, they could leave Sheldon. She testified that she remembered telling W.J. that Sheldon raped her, but she did not know what rape meant. She also remembered telling the police that Sheldon touched her private parts. She said she never told anyone that this was a lie, but then on further questioning by defense counsel, indicated she did remember saying it was a lie. Later, on redirect examination, J.J. said she shook her head "no" when defense counsel asked her if she had changed her mind about what she had told the police.

The jury next heard the testimony of Officer Ronald Forneris of the Juneau Police Department, who interviewed J.J. in the presence of Schorr. Officer Forneris testified that the interview was videotaped. The district attorney then requested that the jury be permitted to hear the videotape of the interview. Over objection, the trial court judge permitted the videotape to be shown to the jury. The state then offered the testimony of Orlando Manaois, a social worker, who regularly treated sexually abused children. Manaois testified to a number of pressures and circumstances under which a sexually abused child may recant claims of sexual abuse.

At the close of the state's case, Sheldon moved for a judgment of acquittal on Counts II and III of the indictment, on the grounds that the only evidence before the jury to support these charges were the prior inconsistent statements of J.J. uncorroborated by other evidence. The motion was denied. Sheldon did not testify at trial.

The defense called Dr. Randall Wiest, the physician who had examined J.J. He testified that J.J. stated, "[My] dad touched my private parts in ... front—in the front of ... [my] body with his hands." Dr. Wiest testified that his examination revealed no physical evidence of sexual abuse or sexual penetration. However, he conceded on cross-examination that because the examination took place several months after the alleged sexual abuse, he could not rule out the possibility of slight vaginal penetration or the fondling or touching of J.J.'s genitals as she had described.

Dr. Gilberg Kliman, a psychiatrist, testified on Sheldon's behalf. He testified that the procedure used in the police interview of J.J. could have distorted her testimony.

Beatrice Brown, J.J.'s maternal grandmother, also testified. Brown testified she asked J.J. about the charges of sexual abuse when they arose. J.J. apparently told Brown that Sheldon had raped her, but when asked what rape was, she said she did not know and that her brother, W.J., had told her to say that.

The jury acquitted Sheldon on Count I (the Breeze Inn incident). He was found guilty of sexual abuse of a minor in the second degree on Count II (the incident in Sheldon's bedroom) as a lesser-included offense of first-degree sexual abuse of a minor. He was also found guilty of sexual abuse of a minor in the second degree on Count III (the incident in J.J.'s bedroom).

## DISCUSSION

■ Sheldon argues that the trial court erred in failing to dismiss the indictment. Whether to dismiss an indictment is a matter within the discretion of the trial judge. His or her decision shall only be overturned if there is an abuse of discretion. *Merrill v. State*, 423 P.2d 686, 695 (Alaska 1967), *cert. denied*, 386 U.S. 1040, 87 S.Ct. 1497, 18 L.Ed.2d 607 (1967); *Stevens v. State*, 748 P.2d 771, 774 (Alaska App.1988). Sheldon challenges the grand jury indictment on two grounds: (1) The charge to the grand jury regarding the quantum of proof necessary for indictment was constitutionally defective; (2) the state failed to present exculpatory evidence to the grand jury.

### THE CHARGE TO THE GRAND JURY

■ At the beginning of its service, the grand jury was addressed by Superior Court Judge Rodger Pegues. Judge Pegues gave the jury the regular 1987 term charge to the grand jury. He instructed the jury in part:

Ladies and gentlemen of the grand jury:

You have been summoned to serve as grand jurors for the regular 1987 term of the superior court of the State of Alaska, First Judicial District. Your duties as such are of the highest importance to the administration of justice.

By the Constitution of the State of Alaska, no person to be held to answer for a capital or otherwise infamous crime unless on presentment or indictment of the grand jury, ... therefore no person under our law can be put on trial for a felony unless the grand jury, consisting of not less than twelve nor more than eighteen citizens, selected from the dis-

trict, has deliberated and acted upon the accusation, and shall declare, after due and careful consideration, and under the solemnity of their oaths, that there is sufficient evidence for this accusation and trial.

The grand jury is an inquisitorial body vested with the power to investigate what may be found to be offenses against state criminal law. It is designed not only to investigate crime and bring offenders to trial, but to protect persons against unfounded accusations. Thus, there's a double duty imposed upon you—a duty to society—to see that persons against whom there is just grounds for accusation are indicted and held for trial, and to the individual to see that he is not indicted and held for trial except justly and in conformity with law. It is just as much the function of the grand jury to be the vindicator of the innocent as to be the accuser of the guilty. Power implies responsibility, and because as grand jurors your powers are extensive, the preservation of our judicial system calls for great wisdom and the exercise of those powers. Manifestly, if the grand jury is not honest, fearless, independent, and partial, it will not stand as the great bulwark against injustice, tyranny, and corruption....

Although the District Attorney represents the interest of State Government and society in the prosecution of offenders, he or she also must see that justice is done in all cases. He or she will present the cases of persons who have been held to await the action of the Grand Jury, and such other cases have been brought to his or her attention. It will be your duty to inquire into these cases, hear the evidence, and make such disposition of them as the facts may warrant. The District Attorney will subpoena such witnesses as he may consider necessary, as well as such other witnesses as you may direct. However, in this connection you are admonished that you are not to undertake to determine guilt or innocence. That is the exclusive function of the trial jury. Your duty in each case is to determine whether all the evidence taken together is such as would, if unexplained or uncontradicted, warrant a conviction by the trial jury. The determination of guilt or innocence is made by that body. Therefore, you are not required to consider any possible defense to the accusation, you are not bound to hear evidence for the defendant, and the accused has no right to appear before you to present his defense. However, it is your duty to weigh all the evidence submitted to you and when you have reason to believe that other evidence within your reach will explain away a charge, you should order such evidence to be produced, and for that purpose you may require the District Attorney to issue process for other witnesses.

. . . .

An indictment is a written accusation against one or more persons, charging in the commission of a crime. Before an indictment may be returned, it is necessary that a majority of the total number of you, after hearing and considering the evidence submitted, agree to return the indictment. In this event, you will cause the indictment so found to be endorsed "True Bill" and signed by your Foreman, or in his or her absence, the Deputy Foreman, and then return the indictment in an open court, in the presence of you all, for further proceedings....

. . . .

In your investigations, you will consider only legal evidence to the exclusion of mere rumor, suspicion, and hearsay. You should, however, receive all admissible evidence submitted which might throw light upon the matter under consideration, whether tending to establish either the guilt or innocence of the accused. The credibility of the witnesses is for you to determine. That is, you will decide what value to place upon the testimony of each and every witness. You will be assisted in passing on the credibility of witnesses by considering whether the witness or witnesses are interested, whether they are corroborated by other witnesses or circumstances in the case, what opportunity the witnesses had for

determining the matter about which they testify, the reasonableness or probability of the story which the witnesses narrate, and the manner and demeanor of the witnesses testifying before you.

Charge to Grand Jury, First Judicial District at Juneau, Regular 1987 Term.

In the instant case, the grand jury was further instructed by the prosecutor as follows:

When it comes time to deliberate the standard that you need to use in deciding whether you should return a true bill or a no true bill is the same standard that you've applied in other cases and that the Judge instructed you on at the outset. I just want to remind you of it here today —[it] is not to decide whether somebody is guilty or not guilty of an offense but to decide whether there is sufficient evidence to charge the person with a crime to mean that they would—that person would have to come to court and go through a trial for a jury to decide—a trial jury to decide whether they were guilty or not guilty and the standard that you use in making that determination is whether all the evidence unexplained or uncontradicted would warrant the trial jury to find a verdict of guilty.

Sheldon argues that these instructions to the grand jury were insufficient. He contends that the state has a constitutional duty to instruct on and define for the grand jury the quantum of evidence that would warrant a conviction by a trial jury. Sheldon asserts that failure to instruct the grand jury that only proof beyond reasonable doubt "would warrant the trial jury to find a verdict of guilty" violates his due process and equal protection rights under the fifth and fourteenth amendments to the United States Constitution and article 1 sections 1 and 7 of the Alaska Constitution.

Sheldon reasons that the instructions given the grand jury in this case are unintelligible because it is impossible for a grand jury to meaningfully determine whether ev-idence, "if unexplained or uncontradicted would warrant a conviction" without telling the grand jury that in order to "warrant a conviction of the defendant" evidence must persuade the trial jury of the defendant's guilt beyond reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *Beck v. State,* 408 P.2d 996, 997 (Alaska 1965); *Esmailka v. State,* 740 P.2d 466, 470 (Alaska App.1987) (all three cases hold that before a trial judge may permit a trial jury to deliberate on a criminal defendant's guilt or innocence, the evidence must be such that a reasonable person could find guilt beyond reasonable doubt).

Alaska Criminal Rule 6(q) governs the sufficiency of evidence necessary to return an indictment. It provides in relevant part:

The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant.

This language is similar to and apparently taken from former § 66–8–27 ACLA (1949) which provided:

*Sufficiency of evidence to warrant indictment.* That the grand jury ought to find an indictment when all the evidence before them, taken together, is such as in their judgment would, if unexplained or uncontradicted, warrant a conviction by the trial jury.[2]

Our research and the research of the parties has not turned up any case in which a grand jury indictment was dismissed because of an improper charge to the grand jury regarding the sufficiency of evidence. The Alaska Supreme Court has frequently quoted the standard articulated in Criminal Rule 6(q) and has consistently indicated that the grand jury process does not involve a "mini trial" and that a grand jury should return an indictment when convinced of the probability of the defendant's guilt. *See, e.g., Preston v. State,* 615 P.2d 594, 602 (Alaska 1980); *State v. Gieffels,*

---

**2.** This provision has come down unchanged through § 5183 CLA (1933); § 2128 CLA (1913) and § 19, pt. II Carter's Annotated Alaska Code (1900). *See also* § 19 Charlton's Code. The provision is taken from Or. Laws, October 19, 1864, Hill's Ann. Laws, § 1249. The derivation of the compiled laws of Alaska from the laws of Oregon and New York are discussed in *Andreanoff v. State,* 746 P.2d 473, 475 n. 2 (Alaska App.1987).

554 P.2d 460, 465 (Alaska 1976); *Coleman v. State*, 553 P.2d 40, 48 (Alaska 1976); *Taggard v. State*, 500 P.2d 238, 242 (Alaska 1972); *Burkholder v. State*, 491 P.2d 754, 758 (Alaska 1971). It is true that in *Adams v. State*, 598 P.2d 503, 508 (Alaska 1979), the supreme court referred to the burden as one of establishing a *"prima facie* case," but it does not appear that the supreme court meant more than a probability of guilt in using this phrase.[3]

In *Hohman v. State*, 669 P.2d 1316, 1320 (Alaska App.1983), we considered a similar issue and concluded that the following language in a charge to the grand jury did not understate the grand jury's responsibility in determining whether to indict:

> Your duty in all cases is to determine whether there is probable cause to believe that an accused person is guilty of the offense charged. Your duty in each case is merely to determine whether the evidence is such as would, if unexplained or uncontradicted, warrant a conviction by the trial jury, and leave the determination of guilt, or innocence, to that body.

Hohman argued that the grand jury could be misled into believing the trial jury's burden of proof was not beyond a reasonable doubt. This court held that since probable cause was defined in the instruction itself by language set forth in Criminal Rule 6(q), the grand jury was not improperly instructed. By extension, we conclude that the language in Criminal Rule 6(q) is sufficient to convey to the grand jury its responsibilities.

■ In summary, it is clear that the grand jury proceeding is not intended to be a mini trial in which the state would present all of the evidence necessary to establish guilt beyond a reasonable doubt. The supreme court has referred to the prosecutor's burden as introducing sufficient evidence to establish a probability of guilt.[4]

Having carefully reviewed the record and the instructions given the grand jury, we are satisfied that in the context of this case those instructions are not misleading and that Sheldon's constitutional right to equal protection and due process was not violated by the charge given. In our view, reading the entirety of the charge, the grand jury was left with the understanding that it should not return an indictment unless it was satisfied that the evidence presented, if unexplained or uncontradicted, established a probability of Sheldon's guilt and would therefore warrant, *i.e.,* justify, holding Sheldon for trial.[5] We stress

---

3. California and New York have statutes similar to former § 66–8–27 ACLA (1949). *See, e.g., Lorenson v. Superior Court*, 35 Cal.2d 49, 216 P.2d 859, 863 (1950); *People v. Jenning*, 69 N.Y.2d 103, 512 N.Y.S.2d 652, 504 N.E.2d 1079, 1084 (N.Y.1986). Reliance on New York and California decisions is limited however because in both states the legislature has separately adopted statutes utilizing a probable cause standard for evaluating the sufficiency of evidence before the grand jury.

4. In *Preston*, 615 P.2d at 602 n. 21, the supreme court quoted with approval from Justice Jackson's dissenting opinion in *Cassell v. Texas*, 339 U.S. 282, 302, 70 S.Ct. 629, 639, 94 L.Ed. 839 (1950):

> [The grand jury's] power is only to accuse, not to convict. Its indictment does not even create a presumption of guilt; all that it charges must later be proved before the trial jury, and then beyond a reasonable doubt. The grand jury need not be unanimous. It does not hear both sides but only the prosecution's evidence, and does not face the problem of a choice between two adversaries. Its duty is to indict

if the prosecution's evidence, unexplained, uncontradicted and unsupplemented, would warrant a conviction. If so, its indictment merely puts the accused to trial. The difference between the function of the trial jury and the function of the grand jury is all the difference between deciding a case and merely deciding that a case should be tried.

In *Bangs v. State*, 663 P.2d 981, 982 (Alaska App.1983) (citations omitted), we made a similar comment:

> The grand jury is an accusatorial body charged with the task of determining whether sufficient evidence exists to justify initiating formal criminal proceedings against the accused. The grand jury thus deals with probability of guilt; unlike the petit jury, its function does not involve the ultimate determination of guilt or innocence based on proof beyond a reasonable doubt.

5. Our review of Alaska, California, and New York authorities does suggest however that this issue might be appropriate for study by the supreme court's criminal rules committee to determine whether a different charge should be

that in this case the issue before the grand jury was not the quantum of proof or the weight of the evidence but primarily the credibility of a single witness—J.J.

### FAILURE TO PRESENT EXCULPATORY EVIDENCE

■ Sheldon next argues that the prosecuting attorney failed to present exculpatory evidence, from the physician that examined J.J., that "there was no evidence on the physical exam to support the allegation of sexual assault/fondling." When specifically asked whether the child had been examined, the district attorney responded, "I can't answer that question because to answer it would be for me to be testifying."

■ The general rule for presenting exculpatory evidence is found in *Frink v. State*, 597 P.2d 154, 165 (Alaska 1979) (interpreting Alaska Criminal Rule 6(g)). The prosecutor has a duty to present exculpatory evidence to the grand jury. However, "the prosecutor's obligation to present exculpatory evidence to the grand jury does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant...." *Id.* at 166. "Furthermore, the prosecutor need only present evidence material to the charge upon which the defendant is accused: only material substantially favorable to the defendant need be presented." *Tookak v. State*, 648 P.2d 1018, 1021 (Alaska App.1982) (citations omitted).

■ The state concedes, and we agree, that the prosecutor had the duty to inform the grand jury that a medical examination had taken place if he was aware of such an examination. It would be inappropriate for the prosecutor to testify to the details or result of such an examination. However, his duty to aid the grand jury in exercising its responsibility to seek out exculpatory evidence if such evidence exists requires that the prosecutor at least inform the grand jury that the victim of a sexual assault has been examined by a physician.

*See, e.g., Coleman*, 553 P.2d at 48–50 (considering a related issue). We are of the view that a physical examination is of sufficient significance in a case of sexual assault or sexual abuse that the prosecutor charged with the responsibility of presenting a case to the grand jury should undertake to determine whether such an examination had taken place so that he or she will be in a position to adequately advise the grand jury.

■ However, we are satisfied that the error in failing to respond more fully to the grand jury's request did not prejudice Sheldon in this case. A number of factors lead us to this conclusion. First, the grand jury was clearly informed of its right to subpoena witnesses if it felt that exculpatory evidence might be made available. Second, the grand jury was apparently aware that Schorr, the social worker, could probably inform them if a medical examination had taken place, at which point the grand jury could have decided whether it wished to call the doctor. Further, the grand jury's inquiry was related to the issue of penetration. Sheldon was acquitted at trial of the offense charging penetration.

On the issue of sexual contact, it is clear that the evidence from the physician would have been at most negative evidence. As we noted in *Esmailka*, 740 P.2d at 470, "where a party relies on negative evidence, *i.e.*, testimony that a witness did not see an event in order to support an inference that the event did not occur, the rule is that the person allegedly witnessing the event must have been in a position to see it." By extension, where a party relies on a physical examination disclosing no sign of sexual abuse to prove that sexual abuse had not occurred, the circumstances must have been such that if sexual abuse had occurred, some signs would be present. The medical evidence in this case clearly establishes that a medical examination taken a number of months after instances of sexual fondling or contact would probably not uncover signs of that contact. Under the circumstances, Sheldon was not prejudiced by the prosecutor's treatment of the medi-

incorporated into Criminal Rule 6 for the bene- fit of the grand jury.

cal examination before the grand jury. *See, Coleman,* 553 P.2d at 49–50 (where the supreme court held that an active attempt by the prosecutor to discourage the grand jury from calling a medical witness regarding a sexual assault did not invalidate the indictment).

## DENIAL OF MOTION FOR ACQUITTAL

 Sheldon argues that the trial court erred in denying his motion for judgment of acquittal. In evaluating an appeal based upon sufficiency of the evidence, the reviewing court evaluates the evidence in the light most favorable to the state. *Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981); *Ross v. State,* 586 P.2d 616, 618 (Alaska 1978). The standard is whether the finding of guilt is supported by substantial evidence. The evidence must support a conclusion by a reasonable mind that there was no reasonable doubt about the defendant's guilt. *Id.* In this case, the state relied substantially upon J.J.'s grand jury testimony and her interview with the investigating officer which was videotaped and played to the jury to sustain its burden of proof. There is no question that under Alaska law, statements which are admitted as prior inconsistent statements under Alaska Rule of Evidence 801(d)(1)(A) may be used as substantive evidence. *Richards v. State,* 616 P.2d 870, 871–72 (Alaska 1980); *Beavers v. State,* 492 P.2d 88, 94 (Alaska 1971); *Van Hatten v. State,* 666 P.2d 1047, 1050–51 (Alaska App.1983); A.R.E. 801(d) commentary.

Sheldon argues, however, that J.J.'s essentially uncorroborated prior inconsistent statements were not sufficient to convict him. He relies on *Thompson v. State,* 769 P.2d 997, 1000 (Alaska App.1989); *Bodine v. State,* 737 P.2d 1072, 1075 (Alaska App. 1987); and *Brower v. State,* 728 P.2d 645, 648 (Alaska App.1986). These cases stand for the proposition that prior inconsistent statements of a witness which are repudiated at trial are insufficient, standing alone, to permit a conviction. Such statements must be corroborated if the state is to obtain a conviction. In *Bodine,* we

stressed that whether a recanting witness's prior testimony is sufficient and whether it is properly corroborated are questions that have to be decided on a case-by-case basis. It is important to stress that in *Brower,* the leading case, the witness not only testified at trial that no sexual abuse had occurred, but repudiated his grand jury testimony, indicating that he had lied.

In contrast, while J.J.'s direct and cross-examination generated inconsistencies, she essentially testified that she had told the truth to the grand jury and, initially, testified that she did not remember the incidents when asked to recall them at trial. Later, after listening to the grand jury tape on two occasions, she remembered one incident of sexual abuse, but gave the single answer "no" when asked if the other two incidents had occurred. J.J. never testified that she had lied to the grand jury. While she acknowledged that she might have mentioned lying to the police at an earlier stage in the investigation, when counsel asked her if she had changed her mind about what she told the police, she shook her head "no."

Under the circumstances, the jury was able to evaluate J.J.'s credibility as she testified, to observe her demeanor during the police interview which was videotaped, and to consider the number of times J.J. had repeated her charges to the social worker, to the police, to the examining physician, and to the grand jury. The jury could also consider the testimony of the state's expert regarding reasons why a sexually abused child might recant and the testimony of a defense expert regarding the suggestive circumstances surrounding J.J.'s interview by the police. Under the circumstances, we are satisfied that the trial jury had a sufficient basis for evaluating J.J.'s testimony and that there was sufficient evidence to persuade a reasonable mind to find Sheldon's guilt beyond reasonable doubt.

 In addition, Sheldon contends that the use of J.J.'s prior grand jury testimony and prior interview with the police under the circumstances, deprived him of his right to confrontation under the state and

federal constitutions. *See* U.S. Const. amend. VI; Alaska Const. art. 1, § 11. He relies on *Van Hatten*, 666 P.2d at 1049–54. In our view, *Van Hatten* is distinguishable. There, the complaining witness acknowledged her grand jury testimony and testified that she had been truthful in relating the events to the grand jury, but expressed a complete loss of memory at trial as to those events. While J.J. also remembered her grand jury testimony and that it was truthful and, initially, testified that she did not remember the events, she ultimately testified that she remembered that only one incident of sexual abuse had occurred. J.J. was physically present and was cross-examined. Under the circumstances, the trial jury was afforded "a more than ample basis upon which to evaluate her credibility at trial and the truthfulness of her testimony before the grand jury." *Id.* at 1054. We therefore hold that introduction of J.J.'s grand jury testimony and the videotape of her police interview did not deprive Sheldon of his constitutional right of confrontation.

The judgment of the superior court is AFFIRMED.