**Lee Roy NUNN, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3814.**

Court of Appeals of Alaska.

Jan. 22, 1993.

Rehearing Denied April 4, 1993.

Steven Pradell, Birch, Horton, Bittner, & Cherot, Anchorage, for appellant.

Kenneth M. Rosenstein, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Lee Roy Nunn, Jr., was convicted of second-degree sexual abuse of a minor, AS 11.41.436(a)(3)(B), following a jury trial in the Anchorage superior court. Nunn appeals his conviction; he asserts that the government presented insufficient evidence to support his conviction, and he also challenges two of the superior court's evidentiary rulings. We affirm.

In the summer of 1989, Nunn's stepdaughter, J.A.B., was attending camp. On Wednesday, June 21, one of the camp counselors noticed that J.A.B. was crying and asked her what was wrong. J.A.B. told her counselor that her stepfather had sexually abused her by having intercourse with

her. J.A.B. asked the counselor not to tell anyone else because J.A.B. feared that, if the authorities were notified, she would be separated from her stepfather. The camp counselor told J.A.B. that she would have to report what J.A.B. had told her, but only if it was true. J.A.B. affirmed that she had been sexually abused. About twenty minutes later, the counselor took J.A.B. to see the director of the camp. J.A.B. again confirmed the abuse.

On June 23, 1989, J.A.B. was interviewed by a social worker from the Division of Family and Youth Services. J.A.B. told the social worker that she was fearful of losing the love of her mother and stepfather, and the social worker warned J.A.B. that, if her account was true, her stepfather would go to jail. Nevertheless, J.A.B. confirmed that Nunn had had sexual intercourse with her. J.A.B. also confirmed the sexual abuse to a physician who examined her at the behest of DFYS; J.A.B. told the physician that Nunn had often had intercourse with her and that he had also penetrated her with his finger. The physician examined J.A.B. and found that she no longer had a hymen.

The matter was referred to the Anchorage Police Department. On June 27, 1989, Investigator Rodney Bennett interviewed J.A.B. and her mother. The interview with J.A.B. was videotaped. Later that same day, and again the following day, Investigator Bennett interviewed Nunn.

J.A.B.'s mother, Joan Nunn, told Bennett that, when she was informed of the allegations against her husband, she had asked J.A.B. if Nunn had touched her inappropriately. J.A.B. had said yes, but had not gone into details. Mrs. Nunn had then confronted Nunn. Nunn told her that there was some truth to J.A.B.'s allegations. Specifically, Nunn told his wife that he had touched J.A.B.'s breasts and her genitals, and that his genitals had touched hers when they lay in bed next to each other. However, Nunn did not admit to any acts of intercourse. During the last part of Bennett's interview with Mrs. Nunn, she expressed how much she needed Nunn as a husband and a father, and how much she wished to keep the family together.

J.A.B. was embarrassed to discuss the details of the sexual abuse with Bennett. However, she told him that Nunn had touched her "in areas that he shouldn't [have]", and she said that this abuse had occurred "every couple of weeks or so" since she was 12 years old.

Following his interviews with J.A.B. and with Nunn's wife, Bennett interviewed Nunn. Nunn admitted to being "careless" and stated that he had done things "[which] would not look good." Regarding J.A.B.'s assertions that Nunn had touched her genitals and her breasts, Nunn said he did not want to have to "qualify," "correct" or "refute" what his daughter had said. Nunn twice admitted that what J.A.B. had said was "not without merit". Nunn then said that he did not know what he had done. He also stated that he did not want to admit J.A.B.'s allegations because then he would have to go "head to head" with her.

Nunn stated that J.A.B. had been having difficulty in school, and that at bedtime Nunn would talk to J.A.B. to comfort her. Nunn told Bennett that the "degree to which [he and J.A.B.] had been involved in some of these discussions had gone beyond what was proper." Nunn admitted having touched J.A.B., "not initially intentionally— but [I] did—but—[I] admittedly did." Nunn then stated:

I allowed that sort of thing to continue too far. And—when you start that sort of thing—and you have a defect, and I guess I do—it's, it was—I didn't draw the line. I don't want to say all that went into going as far as we did. It was sporadic, spontaneous when it happened, long times apart. Accidental. I'm not without fault. I allowed it to happen. I was old enough to know what was happening. [J.A.B.] wasn't. I would say something more there, but I don't want to say anything about my daughter. But I allowed it to go too far.... I have the greatest regrets.... [W]hat happened was ... an evolutionary thing that went

beyond accidental, it went uh—I'm talking too much, I'm sure.

Nunn then told Bennett that his conduct had stemmed from the fact that he and J.A.B. were close, and that "it rose out of my not controlling it." Nunn said that he was friendly, not forceful or pushy, and that J.A.B. never objected. He said that he backed away if he felt he was going too far. Nunn then admitted that he and J.A.B. "got into a situation which I think went beyond the bounds of acceptable behavior. And I know that." When asked to describe his side of story, Nunn said:

I'll tell you, frankly, I ... wanted to ... come out and tell my wife that—that—[J.A.B.] and I have become too close. And I was on the verge of doing that, I don't know how many times. And I've said that these girls are getting too old to run around here like that when they're in skimpy things and maybe sending signals that you know—that had bothered me or whatever, uh—they were growing up, I was noticing—uh—I thought others would, they needed to be aware of that—and maybe that by my trying to be warm to [J.A.B.] and soliciting her warmth ... in return, that it was having an effect on me that went beyond what a father should admit to. I mean, I've read books where people have gone to confession ... because they had feelings like that, that were aroused in them, that were embarrassing, because their whole life they'd been taught that they shouldn't have that. And, you know, I was right there—and I didn't have the guts to turn it off myself, but I was that close to—trying to go to my wife and say that it's gone too far. And I knew that if, if she were aware of it, as embarrassing as it might be, that her being involved would sort it out. I mean, that's sort of the sense of relief that we have now.

Based upon this investigation, the Anchorage District Attorney's Office presented the case to the grand jury. On December 22, 1989, just before the case was presented, Investigator Bennett and an assistant district attorney interviewed J.A.B.; J.A.B. repeated her allegations of sexual abuse and, using dolls, demonstrated what had happened to her. Investigator Bennett also sat with J.A.B. and Mrs. Nunn while all three were waiting to testify at the grand jury. Neither J.A.B. nor her mother said anything to Bennett indicating that their prior statements had not been true.

However, when J.A.B. testified at the grand jury, she recanted her allegations of sexual abuse. She testified that Nunn had never had intercourse with her, and she asserted that Nunn had touched her breasts only twice, both times accidentally. J.A.B. told the grand jury that she had invented her story of sexual abuse in order to retaliate against Nunn for an incident in which he had disciplined her. Joan Nunn supported her daughter's recantation; she testified that, in early November (approximately seven weeks before the grand jury proceeding), J.A.B. had admitted to her that the allegations of sexual abuse were false.

Nevertheless, after the grand jury heard the testimony of the camp counselor, the examining physician, the social worker, Investigator Bennett, and several other witnesses who had knowledge of the case, the grand jury indicted Nunn both for first-degree sexual abuse of a minor (sexual penetration), AS 11.41.434(a)(2), and for second-degree sexual abuse of a minor (sexual contact), AS 11.41.436(a)(3).

### The Playing of J.A.B.'s Videotaped Police Interview

At Nunn's trial, J.A.B. again testified that her allegations against Nunn were false. As she had at grand jury, J.A.B. testified that Nunn had never had intercourse with her and had touched her breasts only accidentally; she reiterated that she had invented her story of sexual abuse because she was angry with Nunn. J.A.B. asserted that she was now telling the truth, both because she was afraid of getting in trouble and also because she wanted Nunn to move back in with her and her mother.

The prosecuting attorney asked J.A.B. if she had still been angry with Nunn when, long after her initial report, she was inter-

viewed by Investigator Bennett. J.A.B. admitted that she had no longer been angry at that time. The prosecutor then asked J.A.B. why she had lied to Bennett about the sexual abuse if she had no longer been angry; J.A.B. could give no reason. The prosecutor pressed J.A.B. about specific statements she had made during her interview with Bennett: her statements that Nunn had touched her breasts, that Nunn had touched her genitals and breasts with his mouth, and that Nunn had touched her genitals with both his hand and his penis. J.A.B. admitted making these statements, but she continued to assert that they were all false. She testified that Bennett had relentlessly and repeatedly questioned her about the sexual abuse; to make him stop asking those questions, she told Bennett what she thought he wanted to hear.

▄ Following J.A.B.'s testimony, the prosecutor asked permission to play the videotape of J.A.B.'s interview with Bennett on June 27, 1989. The prosecutor argued that the tape was admissible because it contained prior inconsistent statements of J.A.B. *See* Alaska Evidence Rule 801(d)(1)(A). Nunn's attorney objected, arguing that the tape was inadmissible because J.A.B. had already been confronted with the prior inconsistent statements and had admitted making them. The prosecutor responded by arguing that the jury should see the videotape because the tape not only captured J.A.B.'s words but also revealed her demeanor when she made her allegations of sexual abuse. The trial court ruled that the videotape could be played.

Nunn challenges this ruling on appeal. He relies on *Patterson v. Cushman,* 394 P.2d 657, 661 (Alaska 1964), for the proposition that, once a witness admits making a prior inconsistent statement, the cross-examining party is not entitled to introduce extrinsic evidence (for instance, a written copy or a tape) of that prior statement. In *Patterson,* a witness had been confronted with a prior written statement that contradicted his testimony at trial; the witness admitted making the statement. When the cross-examining attorney asked to have a copy of the witness's written statement

admitted as an exhibit, the trial judge refused. On appeal, the supreme court upheld the trial judge's action:

> [The witness] admitted making the statements contained in the writing.... That ended the inquiry. The material portions of the statement had been read to the jury, leaving no need for further proof on the subject. The written statement would not have contradicted [the witness] any more than his admission had already done.

*Patterson,* 394 P.2d at 661.

However, in *Bentley v. State,* 397 P.2d 976 (Alaska 1965), the supreme court reached the opposite conclusion, ruling that it had been error for a trial judge to exclude extrinsic evidence of a witness's prior inconsistent statement. In *Bentley,* as in *Patterson,* the witness admitted making the prior inconsistent statement. However, the court viewed *Patterson* as distinguishable because, in *Bentley,* (1) the crucial issue at trial was whether the jury should credit the witness's present testimony or should instead credit her prior inconsistent statement, and (2) the extrinsic evidence offered by Bentley (an audiotape) demonstrated the complete context of the witness's prior statement. *Bentley,* 397 P.2d at 978. For these reasons, the court concluded, there was a reasonable possibility that the jury would view the facts differently if they heard, not simply the witness's unelaborated concession that she had previously made inconsistent statements, but the tape of the conversation in which she had made those statements. *Id.* at 979.

In *Clifton v. State,* 758 P.2d 1279, 1283 (Alaska App.1988), this court construed the *Bentley/Patterson* couplet to signify that a trial court has discretion to admit extrinsic evidence of a witness's prior inconsistent statement. That discretion was not abused here.

In Nunn's case, as in *Bentley,* one of the critical issues facing the jury was whether to credit J.A.B.'s trial testimony or her conflicting prior statements. Had J.A.B. been lying when she accused Nunn of sexu-

ally abusing her, or was J.A.B. lying when she testified that no sexual abuse had occurred? Here, a videotape preserved J.A.B.'s demeanor as she told Investigator Bennett about the sexual abuse in an interview that was held only a few days after J.A.B. first reported the abuse to her camp counselor. The trial judge could reasonably conclude that, because the videotape displayed J.A.B.'s demeanor, the tape had substantial probative value beyond the mere words recorded on it. The trial court therefore did not abuse its discretion when it decided to allow the playing of the videotape.

Nunn argues in the alternative that, even if the videotape was potentially admissible as extrinsic evidence of J.A.B.'s prior inconsistent statements, the State nevertheless failed to establish a proper foundation for the tape's admission under Alaska Evidence Rule 613(b). That rule states:

> Before extrinsic evidence of a prior contradictory statement ... may be admitted, the examiner shall lay a foundation for [the witness's] impeachment by affording the witness the opportunity, while testifying, to explain or deny any prior statement....

Nunn argues that the prosecutor failed to ask J.A.B. about all the inconsistent statements contained in the videotaped interview.

■ We believe that Nunn's interpretation of Rule 613(b) is unreasonably narrow. In answer to the prosecutor's questions, J.A.B. testified that she had lied to Investigator Bennett; she stated that Nunn had done absolutely nothing wrong. At this point, the prosecutor asked J.A.B. about specific statements she had made to Bennett during the interview: her statement that Nunn had touched her genitals, both with his hand and with his penis, her statement that Nunn had touched her breasts and her genitals with his mouth, and her statement that Nunn had penetrated her genitals with both his finger and his penis. In each case, J.A.B. recanted these statements, testifying that she had lied when she said these things to Bennett.

Under these circumstances, the trial judge could reasonably conclude that J.A.B. would continue to categorically deny all allegations of sexual abuse and would continue to disown any and all statements she had previously made to the contrary. The trial judge could therefore conclude that J.A.B. had been given sufficient opportunity to explain or deny the statements she made during her interview with Bennett, and that it was pointless to require the prosecutor to continue asking J.A.B. about every other statement she had made during that interview. *See Bodine v. State*, 737 P.2d 1072, 1074 (Alaska App. 1987). We uphold the trial court's ruling that the State established a proper foundation under Rule 613(b) for introducing the videotape.

### Sufficiency of the Evidence

Nunn argues that the State failed to present sufficient evidence to support his conviction. He relies on *Brower v. State*, 728 P.2d 645 (Alaska App.1986), in which this court held that a criminal conviction cannot rest on the uncorroborated prior accusations of a victim/witness who recants those accusations at trial.

■ While *Brower* does establish the requirement of corroborating evidence, this corroborating evidence need not take any specific form, and it need not independently establish the crime. *Sheldon v. State*, 796 P.2d 831, 839 (Alaska App.1990); *Thompson v. State*, 769 P.2d 997, 1000 (Alaska App.1989); *Bodine*, 737 P.2d at 1075. "The rule governing corroboration is a flexible one, ... grounded in common sense: corroborating evidence is sufficient [when] it induces a rational belief in the truthfulness of a witness' testimony." *Bodine*, 737 P.2d at 1075.

■ In Nunn's case, as in *Bodine*, there was sufficient corroborating evidence to sustain the conviction. Nunn's statements to Investigator Bennett establish good reason to believe that he was sexually attracted to J.A.B. and that his actions had exceeded the boundaries of normal parental affection. Mrs. Nunn initially supported her daughter's accusations; in June 1989,

she told Bennett that Nunn had admitted to her that he had engaged in sexual misconduct with J.A.B. Further, the jury was able to view the videotape of J.A.B.'s interview with Investigator Bennett, and the State presented expert testimony regarding why a child would be motivated to retract allegations of sexual misconduct against a parent. *See Sheldon*, 796 P.2d at 839. This evidence was sufficient to corroborate J.A.B.'s pre-trial allegations of sexual abuse.

■ Nunn next argues that there was insufficient evidence to establish that he touched J.A.B.'s breasts through her clothing as opposed to touching them directly. (As will be discussed in more detail below, one count of the indictment charged Nunn with touching J.A.B.'s breasts directly, underneath her clothing, while another count charged Nunn with touching J.A.B.'s breasts through her clothing. Nunn was convicted of this latter count.)

Nunn is correct that J.A.B., in her pre-trial statements, never explicitly identified distinct incidents in which Nunn touched her breasts through her clothing as opposed to touching her breasts directly. However, J.A.B. told Investigator Bennett that Nunn had touched her on areas of her body where he should not have touched her. Seeking to identify these areas, Bennett asked J.A.B. the following questions:

BENNETT: Would it have been above the shoulders that he would touch you?

. . . .

J.A.B.: No.

BENNETT: Okay, would it have been below the shoulders?

J.A.B.: Yes.

BENNETT: Would it have been above or below the waist?

J.A.B.: Above.

BENNETT: Above the waist? Okay, so it would have been between your shoulders and your waist that he touched you?

J.A.B.: Uh-huh.

BENNETT: Is that yes? Okay. Would it have been on your back or on your front side?

J.A.B.: Front.

BENNETT: Would it have been on the outside of your pajamas or underneath?

J.A.B.: Outside.

Viewing this evidence in the light most favorable to upholding the jury's verdict, *Napayonak v. State*, 793 P.2d 1059, 1061 (Alaska App.1990), the evidence was sufficient to allow the jury to conclude that Nunn had touched J.A.B.'s breasts through her clothes.

■ Nunn also argues that the State failed to prove all the elements of "sexual contact" because the State failed to prove that Nunn touched J.A.B.'s breasts with the specific intent to achieve sexual arousal or gratification. Nunn relies on *Flink v. State*, 683 P.2d 725 (Alaska App.1984) (per curiam). However, *Flink* was based on a construction of the then-existing definition of "sexual contact" in AS 11.81.900(b). In response to *Flink*, the legislature amended the definition of "sexual contact" so that it no longer requires proof of a specific sexual intent. *Van Meter v. State*, 743 P.2d 385, 389–391 (Alaska App.1987).

■ Finally, Nunn argues that his conviction must be reversed because, at trial, J.A.B. never explicitly pointed to Nunn and identified him as the man who had sexually abused her. While this is the normal method of identifying the defendant as the perpetrator of the crime, it is not the only way. An in-court identification is not necessary when the evidence supports the inference that the defendant was in fact the person who committed the crime. *State v. Hutchinson*, 99 N.M. 616, 623, 661 P.2d 1315, 1322 (1983).

■ J.A.B. identified her abuser as "[her] stepdad, Lee". Joan Nunn testified that she was Nunn's wife and that J.A.B. was her daughter from a previous marriage. Mrs. Nunn told Bennett (when she was interviewed in June 1989) that Nunn had admitted touching J.A.B.'s breasts. Moreover, Nunn himself admitted to Bennett that J.A.B.'s allegations were partially true. Viewing this evidence, and the inferences to be drawn from it, in the light most favorable to upholding the jury's verdict,

there was sufficient evidence to establish that Nunn was the person who had committed the crime.

In conclusion, the evidence presented at trial was sufficient to sustain Nunn's conviction.

### Failure of the Jury Instructions to Require the Jury to Unanimously Agree on a Discrete Incident

The jury convicted Nunn of second-degree sexual abuse of a minor as charged in Count III of the indictment. In Count III, Nunn was charged with touching J.A.B.'s breasts through her clothing during the period August 1988 through June 1989.

 On appeal, Nunn argues that the jury's verdict is flawed because the jury was never explicitly told that they had to unanimously agree on a specific incident of touching. Nunn is correct that, when a defendant is charged with engaging in many acts of sexual abuse over a period of time, Alaska law requires the jury to agree on a specific incident of abuse. *Covington v. State*, 703 P.2d 436, 440 (Alaska App. 1985), *as modified on rehearing*, 711 P.2d 1183 (Alaska App.1985). However, Nunn did not object to the jury instructions on this ground. We therefore review this issue only for plain error. *Covington* (on rehearing), 711 P.2d at 1184.

 Nunn was indicted on four counts of second-degree sexual abuse. Each count charged a very specific form of sexual contact: "touching J.A.B.'s breasts underneath her clothing with his hand", "touching J.A.B.'s breasts over her clothing with his hand", "touching J.A.B.'s breasts with his mouth", and "touching J.A.B.'s [genitals] over her clothing with his hand". The jury was instructed to determine Nunn's guilt or innocence of the specific conduct charged in each count.[1]

Because of the manner in which the different counts were framed, Nunn's case does not present the same legal difficulty

as *Covington*. In *Covington*, the defendant was charged with several counts of unlawful sexual penetration. Each count covered a different, non-overlapping period of time, and each count was supported by evidence disclosing dozens of acts that fit the definition of the crime charged. *Covington*, 703 P.2d at 438. "In such a case, the twelve jurors may agree that the defendant committed at least one of the incidents, but be in general disagreement as to which incident that was." *Covington* (on rehearing), 711 P.2d at 1185.

In Nunn's case, however, each count of the indictment covered the same period of time (August 1988 to June 1989) and was distinguished from the others by a precise description of the type of sexual contact alleged. Moreover, the jury convicted Nunn of Count III and yet were unable to reach a verdict on the other counts. (The court declared a mistrial as to those counts, and they were eventually dismissed.) It appears, therefore, that the jury gave separate consideration to each specific form of sexual contact alleged against Nunn, and that, after weighing the evidence pertaining to each form of sexual contact, the jury found this evidence to have varying degrees of convincing force.

To the extent that Nunn may have touched J.A.B.'s breasts through her clothing on several occasions between August 1988 and June 1989, Nunn has not shown that the evidence pertaining to any single such touching was materially different from the evidence pertaining to any other. The question confronting the jury was whether to believe Nunn's defense (that no purposeful touching had occurred) or to believe J.A.B.'s pre-trial statements. This being so, Nunn's challenge to his conviction is governed by the decision on rehearing in *Covington*, where this court held, under similar circumstances, that even though there was a conceivable ambiguity as to the incident underlying the jury's verdict, this ambiguity had not appreciably affected the verdict.

---

1. In one instance, the jury instructions departed from the language of the indictment. Count II of the indictment charged Nunn with "touching J.A.B.'s breasts underneath her clothing with his

hand". Jury Instruction 33 abridged the grand jury's description of the crime to "touching J.A.B.'s breast with his hand". Nunn did not object to this change in wording.

In short, Nunn has failed to convince us of the reasonable possibility that the jury's verdict on Count III reflects a divergence of opinion among the jurors as to what exactly Nunn had done. We find no plain error.

### Propriety of Allowing the State to Present the Testimony of a Former Assistant District Attorney

During the State's case-in-chief, the prosecutor indicated that she might wish to call Maurice McClure to the stand. Ms. McClure had been an assistant district attorney in the Anchorage District Attorney's Office when the sexual abuse of J.A.B. was reported to the authorities. Working in conjunction with Investigator Bennett, McClure prepared the case against Nunn for presentation to the grand jury. More particularly, McClure interviewed both J.A.B. and Joan Nunn on December 22, 1989, just before those two witnesses testified at grand jury and unexpectedly recanted their allegations against Nunn. McClure subsequently left the District Attorney's Office and took a job with the Anchorage Attorney General's Office. Another attorney represented the State at Nunn's trial.

Nunn objected that, if McClure were to testify, then the District Attorney's continued participation in the case would violate Disciplinary Rule 5–102(A) of the attorneys' Code of Professional Responsibility. As discussed in more detail below, DR 5–102(A) generally requires a law firm to withdraw from a case when it becomes apparent that any member of the firm will be called as a witness on behalf of their client.

The trial judge ruled that McClure's testimony would not disqualify the Anchorage District Attorney's Office from pursuing the case against Nunn. The judge concluded that the District Attorney's Office was not like a normal law firm:

> The prosecution of criminal cases is mandated to be the responsibility of the executive branch of government. This responsibility is fulfilled [in] the State of Alaska by prosecuting cases through the District Attorney's Office. Unlike a private litigant in a civil case, the State of Alaska cannot simply withdraw from a criminal case and have [another law] firm be substituted in to fulfill that duty imposed by law.

> Although the initial reaction this court had was to preclude Ms. McClure from testifying, ... this court has found no support in the case law to support the exclusion [or] the prevention of Ms. McClure from testifying in this case. Therefore, Ms. McClure will be permitted to testify ..., but her testimony shall be limited to those representations purportedly made by Joan Nunn and [J.A.B.] during that [particular] morning meeting that she had with them on the date the case was presented to the grand jury.... [S]tatements made to her by Joan Nunn and [J.A.B.] are being admitted as prior inconsistent statements under Evidence Rule 613 and Evidence Rule 801(d)(1)(A).

Following this ruling, Nunn continued to argue against McClure's testimony, but he shifted ground. Rather than challenging the court's ruling on DR 5–102, Nunn's attorney told the court that DR 5–102, "the disciplinary rule that I cited[,] was more or less just a bit of additional information for the court to consider[.] ... I don't think it should be the focal point of ... the court's decision." The defense attorney told the court that his real objection to McClure's contemplated testimony was that McClure, as a former prosecuting attorney, would have "an aura of expertise ... over and above ... any other witness." Nunn's attorney did not provide the court with any legal authority to support his objection to McClure's testimony. Rather, he simply asserted that he knew of no authority to support the court's ruling—although he admitted, "I'm not certain that means much, because there's lots of things I don't know precedent for." The court reaffirmed its ruling.

However, having won this legal battle, the State chose not to call McClure during its case-in-chief. The issue arose again two days later, after Nunn had called both Joan Nunn and J.A.B. as witnesses for the de-

fense. The prosecutor announced that she wished to call McClure as a rebuttal witness.

Nunn again objected that McClure's testimony would be improper. Nunn's attorney argued that, if the court allowed McClure to take the stand, this would in effect allow the District Attorney's Office to play a dual role as both advocate and witness against Nunn. Nunn's attorney also argued that anything McClure might say would simply be redundant of the testimony that Bennett could give if he were recalled to the stand.

The trial judge re-affirmed his previous ruling—that McClure could testify within the limited area of inconsistent statements that Joan Nunn and J.A.B. had made to McClure during their pre-grand jury interview of December 22, 1989. The court pointed out that Nunn had still failed to provide any legal authority to support his objection: "I cannot condemn [this] practice without any supporting case law."

McClure then took the stand. She testified that, while J.A.B. had been hesitant to discuss the specifics of the sexual abuse during their interview, J.A.B. had used dolls to portray what had happened to her and she affirmed that her stepfather had done these things. McClure also testified that, following her interview with J.A.B., she then interviewed Joan Nunn. McClure stated that, during these pre-grand jury interviews, neither J.A.B. nor Mrs. Nunn ever said anything to indicate that their previous statements to Investigator Bennett had been untruthful.

On appeal, Nunn renews his argument that McClure should not have been permitted to testify. He argues first that McClure's testimony was merely cumulative of what Bennett could have said. However, when this argument was raised in the trial court, the prosecutor responded by pointing out that Bennett had admitted, at various times in his testimony, that he did not know or could not recall the answers to specific questions pertaining to the interview with J.A.B.. Moreover, Bennett had admitted that he did not participate in or overhear McClure's interview

with Joan Nunn. On appeal, Nunn does not address or contradict the prosecutor's assertions.

Nunn also argues that, assuming McClure had relevant testimony to give, the District Attorney's Office should have been required to withdraw from the case before McClure was allowed to testify. However, Nunn did not present this argument to the trial court. At trial, Nunn argued that McClure should be barred from testifying—not that she should be allowed to testify after the District Attorney's Office was removed from the case.

Moreover, even assuming that Nunn's argument was preserved, we find that the trial judge did not abuse his discretion when he allowed McClure to testify. Disciplinary Rule 5–102(A) states:

**Withdrawal as Counsel When the Lawyer Becomes a Witness.**

(A) If ... a lawyer learns ... that he or [another] lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm ... shall not continue representation in the trial, except that he may continue the representation and he or [the other] lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

Of the exceptions listed in DR 5–101(B)(1)–(4), only one is pertinent here:

(B) A lawyer ... may undertake ... employment and he or [another] lawyer in his firm may testify:

. . . . .

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

When the trial judge denied Nunn's challenge to McClure's testimony, he pointed out that the District Attorney's Office was obliged by law to prosecute criminal cases, and that "[u]nlike a private litigant in a civil case, the State of Alaska cannot simply withdraw from a criminal case and have [another law] firm be substituted in to

fulfill that duty." The judge's ruling might reasonably be interpreted as a finding that the exception listed in DR 5–101(B)(4) applies to criminal prosecutions— that withdrawal of the Department of Law "would work a substantial hardship on the client because of the distinctive value of the lawyer or [the] firm as counsel".

Moreover, leaving aside the proper interpretation of DR 5–101(B)(4) (an issue which the parties have not briefed), this court's decision in *O'Brannon v. State*, 812 P.2d 222 (Alaska App.1991), makes it clear that the District Attorney's Office is not disqualified simply because another member of the Department of Law testifies for the State.

The defendant in *O'Brannon* was prosecuted for criminal contempt of court after she violated an injunction that had been obtained by the Consumer Protection Division of the Attorney General's Office. 812 P.2d at 224–26. The assistant attorney general who had pursued the civil action against O'Brannon sat at counsel table during the criminal prosecution and assisted the prosecutor in much the same fashion as the primary police investigator often assists the prosecutor at a felony trial. *Id.* at 226–27.

This court held that, when another government lawyer participates in a criminal prosecution in a strictly delineated, non-attorney role, there is no violation of the ethical and litigation concerns underlying DR 5–102(A). The court cited with approval the decision in *People ex rel. Younger v. Superior Court (Rabaca)*, 86 Cal.App.3d 180, 150 Cal.Rptr. 156 (Cal.App.1978), where the California Court of Appeal refused to disqualify an entire district attorney's office when one of the assistant district attorneys testified as a witness for the prosecution.

[T]he problem with having a prosecutor-witness is that the prosecutor's testimony might be accorded too much weight. [But when] the prosecutor-witness [is not] the prosecutor at trial, there would be no problem with enhanced credibility.... [T]here would be no impropriety in the prosecutor testifying, as long as he did not hold himself out to be the prosecutor at trial. Finally, ... there could be no impropriety in having the prosecutor argu[e] the credibility of a prosecutor-witness to the jury, because there was no functional difference between that and the district attorney arguing the credibility of an investigator.

*O'Brannon*, 812 P.2d at 227 (citations omitted). This court concluded, "We believe that [in O'Brannon's case] the trial court could properly find that [the assistant attorney general's] actions during the trial were consistent with those of being an investigator and that the problems of credibility and impropriety that are the basis for DR 5–102(A) did not arise." *Id.* at 227.

Similarly, we find that the trial judge in Nunn's case did not abuse his discretion when he allowed McClure to testify. McClure's role in Nunn's trial was much more limited than the role played by the assistant attorney general in *O'Brannon*. McClure gave relatively brief testimony during the State's rebuttal case. (McClure's testimony, including direct examination, cross-examination, and re-direct examination, covers 16 pages of transcript.)

We recognize that McClure was the attorney who screened Nunn's case and who prepared it for grand jury; she probably had formed opinions about the various people involved in the case, and she potentially had access to information beyond the bounds of the evidence the jury heard. However, before McClure took the stand, the trial judge expressly ruled that McClure's testimony would be confined to the issue of any prior inconsistent statements of J.A.B. and Joan Nunn on December 22, 1989. Nunn does not assert that this limitation was violated. In fact, Nunn explicitly argues on appeal that McClure said nothing that might not just as easily have come from the mouth of a police investigator. Under these circumstances, McClure's appearance as a witness in Nunn's prosecution did not violate the rule enunciated in *O'Brannon*.[2]

---

**2.** Nunn cites *Pease v. District Court*, 708 P.2d 800 (Colo.1985), for the proposition that an en-

Nunn also argues that McClure was under political pressure to prosecute Nunn, that McClure was predisposed to believe J.A.B.'s allegations of sexual abuse and to disbelieve her later recantation, and that McClure's testimony at trial was inaccurate and misleading. Nunn's assertions were potential avenues of cross-examination, but they do not disqualify McClure from appearing as a witness.

### Conclusion

The judgement of the superior court is AFFIRMED.

tire prosecutor's office must be disqualified whenever any past or present member of that office is called as a witness for the government

in a criminal case. We conclude, however, that *Pease* is inconsistent with Alaska law on this question.